# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Tyler*, 2012 IL App (3d) 100970

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC TYLER, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-10-0970 |
| Filed<br>Rehearing denied | August 23, 2012<br>September 20, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The improper admission of bloodhound tracking evidence in an armed robbery prosecution was harmless under the plain-error doctrine and defense counsel's failure to object to that evidence did not constitute ineffective assistance of counsel, since the evidence was not closely balanced and there was no reasonable likelihood the result of the trial would have been different if the evidence had been challenged. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 08-CF-2194; the Hon. Daniel J. Rozak, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Robin Price Robertson (argued), of State Appellate Defender's Office, of Chicago, for appellant. |
| | James Glasgow, State's Attorney, of Joliet (Terry A. Mertel and Mark A. Austill (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. Justice Lytton concurred in the judgment and opinion. Justice Holdridge dissented, with opinion. |

**OPINION**

¶ 1    The defendant, Eric Tyler, was convicted of armed robbery (720 ILCS 5/18-2(a) (West 2008)), and was sentenced to 18 years of imprisonment. On appeal, the defendant argues that: (1) he was denied a fair trial due to the improper admission of bloodhound evidence; and (2) defense counsel was ineffective for failing to object to the admission of the bloodhound evidence. We affirm.

¶ 2                                     FACTS

¶ 3    On September 25, 2008, the defendant was charged by indictment with, *inter alia*, armed robbery (720 ILCS 5/18-2(a) (West 2008)). The indictment alleged that on September 9, 2008, the defendant, Willie Campbell, and Ira Tyler took United States currency by force from Joseph Wilson while using a handgun. The indictment also alleged that the defendant and Ira Tyler took a Leatherman tool by force from Rodney Robinson while using a handgun and that the defendant locked Robinson in a shed while using a handgun.

¶ 4    At trial, Wilson testified that he was working as a clerk at a Clark gas station in Joliet during the early morning hours of September 9, 2008. He paid Robinson to assist him in his duties, although Robinson was not an employee of the gas station. At approximately 4:15 a.m., Wilson and Robinson went outside to the storage shed behind the gas station to get soda to restock the gas station. After they opened the shed and Robinson went inside, three individuals appeared, dressed in loose-fitting black clothes, including gloves and covered faces. Wilson described two of the individuals as short and stocky and the other one as taller with a heavier build.

¶ 5    Two of the individuals went into the shed and the other one put a gun to Wilson's head. Wilson said this individual was an African-American male (the skin around his eyes was visible) who was approximately 5 feet 5 inches tall. The individual told Wilson to give up his keys, and Wilson complied. This individual told the others he was going to shut the power off to the gas station and that once the power was off, they were to bring Wilson to

the front of the building. Once there, Wilson was told to lie on the ground. One individual sat on Wilson's back and held a gun to his head while the other two individuals went into the cash register, taking what Wilson said was approximately $295 in denominations no larger than twenties.

¶ 6     Robinson testified that he saw two individuals appear with handguns in the shed. They made him lie down, searched him, kicked and punched him, and took a Leatherman tool from him. Robinson stated that the individuals "were kind of lean" and were wearing gold masks; black, loose-fitting hooded sweatshirts; dark blue pants; and black shoes. He also noticed that one of the individuals was wearing black gloves with a dark gray insignia on the back. The individuals left the shed and locked Robinson inside. Robinson then called the police from his cell phone and kicked the shed door open once he heard the police arrive.

¶ 7     Joliet police sergeant John Stefanski testified that he was one of the officers who responded to the robbery. All of the responding officers that arrived approached the gas station secretly, and Stefanski approached from the rear of the building. He observed three individuals in dark clothing begin to run eastbound from the gas station. The individuals climbed over a guardrail that divided the gas station from the Pizza Hut, but one of the individuals tripped and fell. Stefanski apprehended the individual who fell. Stefanski handcuffed and searched the individual, who said his name was Ira Tyler. Ira had a gun in his waistband, which was a Colt 45 modified to fire .22-millimeter rounds, and he did not appear to be under the influence of drugs. Ira also gave Stefanski his address as 1103 West Marion Street.

¶ 8     Ira, who was the defendant's cousin, testified that he was currently serving a prison sentence for his role in this armed robbery, as well as for obstruction of justice. In September 2008, his mother, Sheryl Jessup, and his brother, Devon, lived at 1103 West Marion Street, where Ira stayed at times. The Clark gas station that he robbed was approximately one block away from his mother's residence at 1103 West Marion Street.

¶ 9     Ira claimed on the stand that he did not remember anything from the day that he robbed the gas station. He claimed he was on cocaine that day and remembered waking up at the police station. He also said he did not talk to either the defendant or Willie Campbell that day, and that he did not plan the robbery with the defendant or Campbell. Stefanski was later recalled and testified that Ira was lucid and gave his address immediately upon request.

¶ 10    Campbell testified that he was currently serving a prison sentence for his role in this armed robbery and for unlawful possession of a weapon. Initially, he stated that he did not want to testify against the defendant or Ira, but the court informed him that he had already been convicted of the armed robbery and the failure to testify would result in a contempt finding. Campbell then agreed to testify and stated that he was 5 feet 5 inches tall and weighed 120 pounds. Ira and the defendant were his cousins. He stated that he committed the robbery with Ira only. He claimed that he lied in his statement to the police in which he said he was present during a conversation between the defendant and Ira in which they planned the robbery. He then testified that they put a gun to his head and forced him to help commit the robbery. He claimed that he gave approximately five interviews to the police that night and that he lied in all of them because the police told him he could go home if he told them

what they wanted to hear. He had been to the residence at 1103 West Marion Street "[m]aybe one time," and he stated that he was on ecstacy and alcohol on the night of the robbery. When asked if the defendant participated in the robbery, Campbell said, "[n]ot that I know of."

¶ 11     The State also introduced a video of Campbell being interviewed by the police. Joliet police detective Moises Avila testified that he conducted five interviews of Campbell. Avila denied telling Campbell he could leave if he cooperated. Avila stated that Campbell's story changed over the course of the interviews. Initially, Campbell said he had been with his girlfriend all night. Later, he said he was an innocent bystander who overheard the planning of the robbery. Later, he said he was forced to participate in the robbery and that the defendant took his phone. Avila stated that two of the five interviews had been videotaped.

¶ 12     Joliet police officer Shawn Wascher testified that he also responded to the gas station, which was at approximately 4:40 a.m. He observed three African-American males exit the gas station quickly. They were dressed in black hooded sweatshirts with the hoods up. He saw Stefanski apprehend one of the individuals and he chased the other two individuals who ran eastbound from the gas station. However, the individuals turned down a dark gangway between the Pizza Hut and a house, so he suspended his pursuit for safety reasons and because he did not want to "ruin the track," which he explained was the scent track for a canine. The police then set up a perimeter over a few blocks.

¶ 13     Wascher stated that the police ended up at the residence at 1103 West Marion Street later that night. He said that they went there because they heard over the radio that the canine had tracked a scent there. He also said that they went there because they heard over the radio that the individual that had been apprehended gave that address as his residence.

¶ 14     Wascher stated that the police searched the residence after obtaining Jessup's permission to do so. He went into the basement and into the bedroom located to the right of a common area. At approximately 6:21 a.m., he found an individual later identified as the defendant lying in a bed. He also found a cell phone next to the defendant on the bed, which kept ringing and indicated the name "Bridgette" on the display. He also found a black hooded sweatshirt on the bed.

¶ 15     At some point later, Wascher went outside with another officer to the alley behind the residence, where they found an individual later identified as Campbell. Campbell was wearing dark clothing, including a black hooded sweatshirt, and his clothes were muddy.

¶ 16     Bridgette Cullum testified that she was Campbell's girlfriend at the time of the robbery. On the night of September 8, 2008, she watched a movie with Campbell at her house. They went to bed around 10 p.m. During the night, Campbell left to go to a gas station. At 12:18 a.m., he called her to request that she let him back into the house. She went back to sleep and woke up around 3 or 4 a.m. Campbell was still there with her. She went back to sleep and was awakened by her mother around 5 a.m. Campbell was no longer there.

¶ 17     Cullum called Campbell's cell phone approximately three times to find out where he was. She indicated on cross-examination that she was not sure what time she placed the calls, but knew that it was sometime before 8 a.m. She also stated that she placed the calls sometime between 8 and 11 a.m. Cullum was shown the phone found next to the defendant and said

it looked like Campbell's phone.

¶ 18    Joliet police detective Christopher Schott testified that he interviewed Cullum. Schott said that Cullum had told him that she went to bed around midnight. Campbell said he was going to a gas station to purchase cigarettes. He called her cell phone around 12:18 a.m. to ask her to unlock the door. They went to bed. When she woke up around 4 a.m. to use the bathroom, he was in bed. At 5 a.m., her mother woke her up, and Campbell was gone. She initially told Schott that she started calling Campbell's cell phone around 11 a.m., but later changed to say that it was between 7 and 8 a.m.

¶ 19    Darren Prochaska testified that he worked as a police officer with the Joliet police department at the time of the incident and was assigned to the canine unit at the time of the robbery. He responded to the scene with his canine, Amber. At the time, he had worked in the canine unit for six years, all of the time with Amber. Amber was trained for "man trailing," or tracking human scent. They attended training seminars and performed in-house training twice per month. Prochaska explained:

> "What we do is collect a scent article from the scene for the person that we're looking for. The scent article is then presented to the dog. She will smell that scent article and remember what that scent smells like, and she will follow where the person had walked."

¶ 20    Prochaska explained that he placed a sterile gauze pad onto the handle of a reciprocating saw that was found inside the gas station, and let the pad sit for approximately 10 minutes. He presented the pad to Amber for her to smell, and she began walking eastbound from the gas station. Using a satellite map of the area provided by the State, Prochaska recounted the path that Amber took from the gas station. After about 10 or 15 minutes, Amber led Prochaska to the backyard of the residence at 1103 West Marion Street. Once there, Amber began walking around in circles, which Prochaska stated was Amber's indicator that she was at the end of the scent trail. On cross-examination, Prochaska clarified that Amber stopped in the general area of the backyard and did not go up to the residence.

¶ 21    Former Joliet police officer Joshua Klima testified that on September 9, 2008, between 4 and 5 a.m., he responded to the call about the robbery. He and Wascher chased the two individuals who fled eastbound from the gas station. He also assisted in the search of the residence at 1103 West Marion Street. He searched the basement and found a large wad of cash in the cushions of a couch in the common area in the basement. He believed that his first count of the cash totaled $477 in denominations no larger than twenties. He also found a pair of black and white gloves behind the couch.

¶ 22    Illinois State Police forensic scientist David Turngren testified that he performed a deoxyribonucleic acid (DNA) analysis on the gloves. There was DNA from at least three people on the inside of the gloves. The defendant could not be excluded as a possible source of the DNA, but Turngren also stated that 58% of African-Americans, 70% of Hispanics, and 78% of caucasians could not be excluded, either.

¶ 23    Devon testified that he was living with his mother, Jessup, at the time of the robbery. He stated that Ira and Jessup's boyfriend also lived there at the time. He claimed that the defendant was at the residence on the night of September 8, 2008. At some point after 10 p.m. that night, Devon, Ira, and the defendant left the residence in Jessup's car, although

Devon was not sure where they went. Sometime later, they returned to the residence. Devon played a video game in the living room the rest of the night without going to sleep. Devon said he did not know if the defendant remained in the residence while he played a video game.

¶ 24      At some point, the police arrived, and they asked Devon some questions. Devon testified that he remembered telling the police that the defendant was not at the residence. He claimed that the police only asked him what he was doing and who was in the residence. Devon said he was playing video games and did not say that the defendant was in the residence. Devon also said that the police asked him about his college hooded sweatshirt and who the defendant was.

¶ 25      On cross-examination, Devon said that it was not unusual for the defendant to come by the residence. He stated that the bedroom downstairs was his and that he played baseball and his equipment, including his batting gloves, was in the basement. On redirect, Devon stated that he and his brother, Ira, were both stocky. He was approximately 5 feet 9 inches and 260 pounds. He said the defendant was probably 5 feet 7 inches and 130 pounds. He was unsure about Campbell's height, but agreed that Campbell probably weighed around 120 to 130 pounds.

¶ 26      When Stefanski was recalled to the stand, he testified that he questioned Devon at the residence around 6 a.m. on September 9, 2008. Devon told him that no one should be in his bedroom. Devon also stated that he had been down in his room approximately 40 to 45 minutes earlier and no one was there. Devon said there was no reason for the defendant to be there, as the defendant had not been there earlier that night. Devon also said there were no large amounts of cash in the residence that belonged to him. Devon also told Stefanski that he had never seen the gloves before and did not know who the owner was of the cell phone found in the basement.

¶ 27      Jessup testified that Ira and Devon were her children. On the night of September 8, 2008, Ira stayed there sometimes, but he was back and forth between there and Ohio. Devon arrived in August and was visiting, but he did not live there. When Devon was there, he usually slept in the basement.

¶ 28      Jessup stated that she moved back into the residence in January 2008, and since that time, the defendant had not been at the residence. No one else had keys to the residence, including Devon, Ira, and the defendant. She admitted on cross-examination that it was possible that the defendant could have visited the residence without her knowledge since Devon returned in August.

¶ 29      Jessup testified that on the night of the incident, she was at the residence with her boyfriend, Ira, and Devon. The phone rang several times that night; Ira said it was the defendant who was calling. She went to bed a little after midnight. The defendant was not there.

¶ 30      Around 2 a.m., Devon woke up Jessup to ask if he could use her car. She could not recall exactly what the reason was that he wanted to use the car, although she said that he either wanted to take Ira to where the defendant was or pick up the defendant to bring him to Ira. She said no and went back to sleep. She was awakened by the police coming to the residence

around 5:45 a.m. She learned from the police that Ira had been arrested. She also learned that the defendant was found in the basement, which surprised her, because she said the defendant had no reason to be there that night. She was also asked about the cash found in the couch in the basement; she denied that it was hers.

¶ 31　On cross-examination, Jessup said that Devon and Ira helped her with a sewer clog in the basement on the evening of September 8, 2008, and that she knew Ira had been smoking marijuana that night.

¶ 32　The State introduced a short surveillance video from behind the gas station that showed two individuals in dark clothing, including hooded sweatshirts with the hoods up, who went in and out of the gas station's storage shed.

¶ 33　During closing arguments, the prosecutor mentioned the bloodhound tracking evidence three times. First, after mentioning that Ira and Campbell were caught, the prosecutor referenced the third individual as follows:

> "Well, that leaves the third guy. Who is the third guy? Well, the third guy is Eric Tyler. You have a bloodhound who comes out to the scene. They set up the perimeter, make sure no one's coming or going. The bloodhound, where does he go? Right to 1103 Marion Street, right to the backyard. Right in the backyard, the door right there that goes to the basement right in front of him when they get there.
>
> What do they do? They talk to the homeowner. They go down. What do you know? Eric Tyler sitting in the basement under some covers."

Defense counsel objected, arguing that the prosecutor was stating facts not in evidence. The circuit court said it would not rule on the objection and instead admonished the jury:

> "You are the ones who determine what the facts are and what the evidence was. What I will tell you is that anything that any of the lawyers say that is not based upon the evidence and what reasonable inferences may be drawn from the evidence should be disregarded by you."[1]

¶ 34　Second, in arguing that the defendant's presence in the residence's basement was indicative of his guilt, the prosecutor stated, "[s]o is that really believable that that's the case? Or is it more believable that they come in there, they find him because the bloodhound tracked him right there? Not to mention. They do find him where the bloodhound tracked him to." Defense counsel did not object to this statement.

¶ 35　Third, in summing up the State's theory of the case, the prosecutor said:

> "When you look at the evidence here, there's really only one conclusion you can draw, the conclusion that these three cousins met up, planned an armed robbery, and then carried it out. Two of them got caught before they can even get back to home base. One guy gets caught on the scene, the other guy's caught right in the neighborhood somewhere. Joliet comes in, bloodhound tracks right back to the home base. There he is with the gloves, with the money, game over. Caught. That's it."

---

[1]The court admonished the jury in a similar fashion several times in response to defense counsel's objections to the prosecutor's statements in closing arguments.

Defense counsel did not object to this statement.

¶ 36     Among other things, defense counsel stated in closing arguments that the canine was tracking Campbell's scent when it led to the residence at 1103 West Marion Street.

¶ 37     The jury returned a guilty verdict.

¶ 38     On December 20, 2010, the circuit court sentenced the defendant to 18 years of imprisonment.

¶ 39                                    ANALYSIS

¶ 40     The defendant's first argument on appeal is that he was denied a fair trial by the admission of bloodhound evidence. The defendant contends that "the State's evidence of guilt was not overwhelming and it heavily relied on the bloodhound's exploits to place [the defendant] at the scene of the crime." The defendant admits that he failed to properly preserve this issue for appellate review, but requests this court to review the issue under the plain-error doctrine because the evidence was closely balanced.

¶ 41     The plain-error doctrine allows a criminal defendant to obtain appellate review of procedurally forfeited errors that occurred at trial. *People v. Rinehart*, 2012 IL 111719, ¶ 15. To obtain plain-error review of a forfeited error, a defendant must show that either: (1) the evidence is close, or (2) the error was serious. *People v. Adams*, 2012 IL 111168, ¶ 21. Under the first prong, which is the prong under which the defendant in this case seeks review, the defendant must establish that " 'there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him.' " *Adams*, 2012 IL 111168, ¶ 21 (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). "In determining whether the closely balanced prong has been met, we must make a 'commonsense assessment' of the evidence [citation] within the context of the circumstances of the individual case." *Adams*, 2012 IL 111168, ¶ 22 (quoting *People v. White*, 2011 IL 109689, ¶ 139).

¶ 42     While it was error for the court to admit the State's bloodhound tracking evidence in this case (*People v. Cruz*, 162 Ill. 2d 314, 369-73 (1994) (discussing the historical treatment of bloodhound evidence in Illinois and holding that "[w]e continue to adhere to the principle that bloodhound evidence is inadmissible to establish any factual proposition in a criminal proceeding in Illinois"); see also *People v. Pfanschmidt*, 262 Ill. 411, 461-62 (1914)), the evidence was not closely balanced. Testimony indicated that the three individuals who robbed the gas station were dressed in loose-fitting, dark-colored clothes, including hooded sweatshirts and gloves. Ira was apprehended while trying to flee the scene, and he gave his address as 1103 West Marion Street. The investigation proceeded to this residence and the 5 feet 5 inches, 120-pound Campbell was apprehended in the area of the residence's backyard. The police searched the residence with Jessup's permission and found the defendant in the basement bedroom. They also found what was alleged to be Campbell's cell phone next to the defendant, which rang with calls from Campbell's then-girlfriend. The police also found a black hooded sweatshirt on the bed, as well as a large wad of cash in the couch in the basement's common area. The police also found a pair of gloves behind the couch that were similar to the description given by Robinson of the gloves worn by one of

-8-

the individuals who robbed the gas station.

¶ 43 Both Jessup and Devon denied ownership of the cash that was found in the basement. Jessup also testified that the defendant was not at her residence that night and had no reason to be there when the police located him in the basement. Devon, who was 5 feet 9 inches and 260 pounds and was stocky like his brother, Ira, testified that the defendant was at the residence that night. However, that testimony was impeached by Stefanski, who testified that he questioned Devon after the defendant was found in the basement and Devon said that no one should have been in his bedroom, the defendant was not there that night, and the defendant had no reason to be there at the time he was found.

¶ 44 Under these circumstances, we cannot say that the admission of the bloodhound tracking evidence " 'alone severely threatened to tip the scales of justice against [the defendant].' " See *Adams*, 2012 IL 111168, ¶ 21; (quoting *Herron*, 215 Ill. 2d at 187). Accordingly, we reject the defendant's argument.

¶ 45 The defendant's second argument on appeal is that defense counsel was ineffective for failing to object to the admission of the bloodhound evidence. In support of his argument, the defendant claims that "[n]o reasonable attorney would have allowed the State to introduce this obviously inadmissible and highly prejudicial evidence," and that "[n]o reasonable attorney would then permit the State to grossly overstate the import of this inadmissible tracking evidence."

¶ 46 To establish ineffective assistance of counsel, a defendant must show that counsel's performance was objectively unreasonable and that, but for counsel's deficient performance, a reasonable likelihood exists that the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984). The failure to prove both prongs is fatal to an ineffective assistance of counsel claim. *People v. Holmes*, 397 Ill. App. 3d 737, 741 (2010).

¶ 47 Our review of the record reveals that the defendant cannot establish that he was prejudiced by defense counsel's performance regarding the bloodhound tracking evidence. As we previously explained, the evidence in this case was not closely balanced. The defendant cannot establish a reasonable likelihood that the outcome of the trial would have been different had defense counsel challenged the State's bloodhound tracking evidence. See *People v. Lacy*, 407 Ill. App. 3d 442, 466 (2011) (analyzing a defendant's argument that defense counsel was ineffective for failing to object to bloodhound tracking evidence and noting that even if its admission was erroneous, it was not prejudicial).

¶ 48                                                   CONCLUSION

¶ 49 The judgment of the circuit court of Will County is affirmed.

¶ 50 Affirmed.

¶ 51 JUSTICE HOLDRIDGE, dissenting.

¶ 52 I dissent. The majority correctly holds that the trial court erred in admitting the

-9-

bloodhound tracking evidence at issue. However, it concludes that this error is not reversible under the plain-error doctrine because the evidence was not closely balanced. See *supra* ¶¶ 42-44. I disagree. Aside from the improper bloodhound tracking evidence, the only evidence implicating the defendant was the following: (1) two hours after the robbery, the police found the defendant sleeping near Campbell's cell phone and a black hoodie[2] at 1103 West Marion Street, the address provided by Ira Tyler when he was apprehended at the scene of the robbery; (2) in an adjacent room, the police found a pair of gloves that did not match the description of the gloves worn by the robber[3] and a stash of money that exceeded the amount taken from the gas station during the robbery; and (3) while he was being interrogated by the police, Campbell said that the defendant was involved in the robbery. However, Campbell recanted that statement during the defendant's trial. The police obtained no fingerprints or other physical evidence at the scene of the robbery implicating the defendant. The defendant did not confess. Campbell and Ira Tyler testified during the defendant's trial, and neither implicated the defendant. In fact, Ira, who pleaded guilty to the robbery, denied planning the robbery with the defendant or speaking with the defendant the day of the robbery or the day before the robbery. Although Campbell testified that he and Ira had committed the robbery, he denied that the defendant was involved. In my view, the evidence of the defendant's guilt was far from overwhelming.

¶ 53    Moreover, our supreme court has recognized that bloodhound tracking evidence is both unreliable and extremely prejudicial. As the supreme court stated:

"[W]e remain unpersuaded that this class of evidence is reliable. Moreover, we recognize that the real danger posed by admitting bloodhound evidence lies not simply in its fallibility, but in its potential to prejudice. It is well known that the exercise of a mysterious power not possessed by human beings begets in the minds of many people a superstitious awe ***. The very name by which the animal is called has a direct tendency to enhance the impressiveness of the performance ***." (Internal quotation marks omitted.) *People v. Cruz*, 162 Ill. 2d 314, 370 (1994).

¶ 54    Further, the prosecutor compounded the inherent prejudice of this evidence in two ways. First, the prosecutor elicited extensive testimony from the dog's handler, who provided a detailed description of the bloodhound's tracking of a scent to the house where the defendant was found. The handler also described the dog's training and abilities and suggested that the dog's tracking was reliable. Second, during closing argument, the prosecutor repeatedly stressed that the bloodhound had tracked a scent from the scene of the robbery directly to the house where the defendant was found, suggesting that this was particularly important and persuasive evidence against the defendant. That distinguishes this case from cases wherein bloodhound tracking evidence was cumulative of other strong identification evidence and therefore not prejudicial. See, *e.g.*, *People v. Lacy*, 407 Ill. App. 3d 442, 466 (2011)

---

[2]Rodney Robinson, one of the robbery victims, testified that the robbers had worn black hooded sweatshirts.

[3]Robinson testified that one of the robbers was wearing black gloves with a grey insignia. The gloves found near the defendant were black and white.

(bloodhound evidence not prejudicial where two witnesses identified the defendant in a photo array, a physical lineup, and in court); *People v. McDonald*, 322 Ill. App. 3d 244, 250 (2001) (admission of limited bloodhound evidence was insufficient to require a mistrial where it was merely cumulative of other admissible testimony); *People v. Lefler*, 294 Ill. App. 3d 305, 309 (1998) (bloodhound tracking evidence was not prejudicial where two credible eyewitnesses identified the defendant as the burglar, and these identifications were "virtually unimpeached").

¶ 55 Given the highly prejudicial nature of bloodhound tracking evidence, the paucity of other evidence linking the defendant to the crime, and the fact that the State made bloodhound tracking evidence the cornerstone of its case against the defendant, I believe that the State's improper use of bloodhound evidence " 'alone severely threatened to tip the scales of justice against [the defendant].' " See *People v. Adams*, 2012 IL 111168, ¶ 21 (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Accordingly, I would find that the trial court's error in admitting this evidence is reversible under the plain-error doctrine. See *Adams*, 2012 IL 111168, ¶ 21; *Herron*, 215 Ill. 2d at 187.

¶ 56 I would also find that the defendant's trial counsel rendered ineffective assistance by failing to object to the admission of the bloodhound evidence. To prove ineffective assistance of counsel, the defendant must demonstrate that: (1) his counsel's performance failed to meet reasonable professional standards; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *People v. Connery*, 296 Ill. App. 3d 384, 389 (1998); *Strickland v. Washington*, 466 U.S. 668, 689-94 (1984). In my view, these standards are easily met in this case. Counsel's failure to object to the State's extensive presentation of unreliable and highly prejudicial bloodhound tracking evidence cannot be deemed a reasonable strategic decision. Moreover, any suggestion that counsel was motivated by strategic considerations rather than a misapprehension of the governing law is belied by the fact that counsel tried to undermine the reliability of the tracking evidence during cross-examination of the dog's handler and during closing argument.

¶ 57 Further, as noted above, the extensive bloodhound tracking evidence presented in this case (and the emphasis that the State placed upon that evidence during closing) was highly prejudicial, and there was almost no other evidence implicating the defendant. Thus, in my view, there is a reasonable probability that, but for counsel's failure to object to the improper bloodhound evidence, the outcome of the trial would have been different.

¶ 58 I would therefore reverse and remand for a new trial.