2020 IL App (2d) 190261-U
No. 2-19-0261
Order filed January 31, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* Marriage of | ) | Appeal from the Circuit Court |
| DAVID TAM, | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 13-D-539 |
| | ) | |
| NICOLE TAM n/k/a KELTCH, | ) | Honorable |
| | ) | Linda Davenport, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Birkett and Justice Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*: Trial court abused its discretion in certain evidentiary rulings and its directed finding in favor of appellee was not supported by the record. Trial court's rulings regarding GAL fees vacated as well.

¶ 2   On September 20, 2017, the circuit court of Du Page County denied the motion of the petitioner, David Tam, to restrict parenting time between his ex-wife, Nicole Keltch, and the parties' oldest son, C. On March 22, 2019, the court awarded the guardian *ad litem* (GAL) fees of $19,878 and denied David's motion to reallocate the responsibility for those fees. David now

appeals these rulings.  We vacate these orders and remand for further proceedings before a different judge.

¶ 3                                     I. BACKGROUND

¶ 4      David and Nicole were married and had two sons.  The oldest, C., was born in 2004, and the youngest, A., was born in 2010.

¶ 5      In March 2013, David filed a petition for dissolution.  Soon after, Nicole left for Colorado with the children, intending to live there permanently.  David obtained a temporary restraining order (TRO) requiring Nicole to return the children to Illinois and granting him temporary sole custody.  A few weeks later, by agreement, the TRO was vacated and temporary joint custody was ordered, with the children to remain in Illinois.

¶ 6      In October 2013, David obtained a plenary order of protection against Nicole.  The trial court hearing the dissolution action found that Nicole had abused David "and/or" the children.  Among other things, the trial court granted David temporary sole custody of the children and restricted Nicole's parenting time, finding that unsupervised visitation "would create a risk of serious endangerment to the children."  In February 2014, the parties agreed to an order vacating the order of protection and allowing Nicole unsupervised visitation.

¶ 7      In March 2015, the trial court entered an agreed joint custody judgment under which David was the primary custodian and Nicole had unsupervised parenting time.  Nicole later moved to Colorado, and the parenting plan was modified to include parenting time both in Colorado and in Illinois when Nicole was here.

¶ 8      By agreement, in the summer of 2016, Nicole took the boys to Colorado for six weeks.  During this time, on several telephone calls David overheard Nicole screaming at C., who was

then 12 years old. When the boys returned, C. said Nicole threw things at him, cursed at him in front of his younger brother, and told him that she would be removing him from David's custody.

¶ 9 In August 2016, David filed a motion to restrict Nicole's parenting time pursuant to section 603.10 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/603.10 (West 2014)). The allegations included the above facts and further alleged that Nicole had shoved and verbally abused C. The motion also alleged that, a few days earlier, Nicole went to David's home (which he shared with his parents), screaming and cursing, and spit in the face of David's mother. The police were called. Nicole had also told the children that she would be at their school when it let out, even if she did not have any scheduled parenting time. The motion alleged that all of these actions had caused the children severe emotional distress and anxiety. The motion requested that Nicole undergo a psychological evaluation and receive counseling, and that parenting time be suspended until she did so. On the same date, David also filed a petition for a rule to show cause, alleging that Nicole's actions violated the terms of previous parenting orders.

¶ 10 In October 2016, the trial court appointed Umberto Davi as the GAL. Davi met with David and C. at David's home. He then met with Nicole at her home in Chicago. Both parents told him their views of the situation. David told Davi that Nicole was bipolar, had a temper, and had hit C., and about the earlier order of protection. Nicole denied hitting C. and showed Davi pictures of her and the boys on fun-looking outings in Colorado. Davi did not ask C. about what had occurred in Colorado, or about the truth of the allegations. Davi was also given the name of the therapist that C. had begun seeing, Jennifer Crumb-Perez, and the school social worker he had seen. Davi did not immediately contact either.

¶ 11 In November 2016, Nicole filed a motion to enforce her previously-allocated parenting time. She had not been able to visit with C. since he returned from Colorado.

¶ 12    A status hearing on the pending motions was scheduled for December 16, 2016. According to Crumb-Perez, Davi first contacted her less than an hour before he was to appear in court, leaving her a voice mail. She was unable to return his call within that period. At the hearing, the trial court asked Davi whether he knew of any reason why unsupervised parenting time should not occur. Davi said no. He did not mention the earlier order of protection or the fact that he had not yet asked C. about the allegations of physical and verbal abuse or spoken with C.'s counselor. The trial court ordered that Nicole have unsupervised twice-weekly visits with the children and appointed Melinda Mathews to provide joint counseling of David and Nicole that would eventually include C.

¶ 13    Later that afternoon, Crumb-Perez was notified about the parenting time ordered between Nicole and C. She wrote a letter detailing her concerns about such parenting time. In it, she stated that she had been told about "numerous anxiety provoking situations and traumatic events such as the police being called to the home, C. running away, his mother spitting on relatives, extreme yelling, verbal and emotional abuse and physical altercations." She reported that, when C. was asked to think about seeing his mother, he showed "symptoms of anxiety and extreme distress as evidenced by: crying, irritability, shaking, mood dysregulation, inability to gather his thoughts and tangential thinking." C. had also reported significant other signs of distress including trouble sleeping and concentrating, anger/aggressiveness, "intrusive and repetitive thoughts of past traumas," and thoughts of suicide. She opined that parenting time with his mother was likely to exacerbate C.'s distress levels and negatively affect his emotional and physical well-being. After receiving a copy of the letter, Davi spoke with Crumb-Perez. He then advised the attorneys for the parties that he did not believe it advisable for C.'s visits with Nicole to commence. The parties agreed to honor this recommendation.

¶ 14     On December 30, 2016, David filed a renewed motion to restrict Nicole's parenting time with C., seeking to modify the order of December 16, 2016. He repeated his earlier allegations of verbal and physical abuse, and attached the letter from Crumb-Perez to support his allegations that C. was exhibiting signs of such abuse. David also noted that, after filing his earlier petition, he had been informed that Nicole smoked marijuana in front of the children and was living with someone who had repeatedly been arrested and charged with offenses relating to marijuana possession. David renewed his request that Nicole attend regular counseling sessions as a condition of parenting time and further asked that (1) Nicole not engage in drug use or allow the presence of her roommate during visits, and (2) visits between Nicole and C. be suspended until C.'s counselor believed that the visits would no longer pose a danger of serious harm to C.'s mental, physical and emotional well-being, or until further order of court. David also filed a separate motion seeking an *in camera* interview of C. by the trial court.

¶ 15     In January 2017, the trial court was advised about the agreement not to move forward with parenting time between Nicole and C. for the moment. At the close of the status, the trial court ordered, among other things, that visits between Nicole and C. be temporarily suspended, visits between Nicole and A. continue, Nicole schedule an appointment with Crumb-Perez, both parties commence joint sessions with Mathews, and the parties complete the PEACE program.

¶ 16     During the spring of 2017, David and Nicole completed the PEACE program and attended some joint counseling sessions with Mathews. Those sessions involved some conflict, and after one such session at which Nicole was yelling, Mathews recommended that Nicole engage in individual counseling.

¶ 17     On May 10, 2017, Crumb-Perez wrote a second letter regarding possible supervised parenting time between C. and Nicole. (In it, she noted that she had received a voicemail from

Davi at 8:30 p.m. on a Sunday night, advising her of a court date the next morning at 9:30 a.m. She was not able to speak with Davi on such short notice and had sent him an email requesting at least 24 hours' prior notice before any other deadlines for updates.) Crumb-Perez's letter stated that, although C.'s symptoms had improved overall since her last report, he was still struggling with anger management as well as symptoms of depression and post-traumatic stress disorder (PTSD). He was not sleeping well and had fallen so far behind with his schoolwork that he felt overwhelmed and had given up on completing assignments. He continued to express anger toward Nicole and toward "the entire custody situation" at almost every session. Although Crumb-Perez had spoken with him about ways he might be able to move forward to begin a more positive relationship with his mother, he expressed no interest in doing so and continued to threaten that he would run away if forced to have visits with her. Crumb-Perez suggested that family therapy sessions involving C. and Nicole might be helpful and stated that she would not be comfortable recommending the resumption of parenting time without such counseling.

¶ 18    Davi arranged for Mathews to conduct a joint session for Nicole and C., and on May 30, he emailed Nicole to tell her the date and that he would also attend. Nicole responded that she was not available on that date. Nicole also expressed anger and frustration, saying that she did not feel any farther along after 10 months and did not want to be "humiliated" by being "abused in front of everyone for an hour." Davi replied that David would not be present and that the joint session was the path forward. Nicole wrote back that she did not want to see Mathews again and would instead contact Crumb-Perez about setting up a joint session with C. She also stated that she had been able to spend an afternoon with both boys on Mother's Day and believed that the best way to reconcile with her children was "by doing things with them," and that the family would be "fine" if she and David simply followed the PEACE program guidelines for healthy communication. She

noted that she and David had agreed that A. could visit her in Colorado during the summer of 2017.

¶ 19    The hearing on David's motion for restricted parenting time and his petition for a rule to show cause took place on September 20, 2017.  David's first witness was Davi.  Part of the testimony involved his role as a GAL.  Davi stated that, although he did view it as his responsibility to investigate the allegations in the petition, he was not a government investigator.  Further, in his view there was no need to investigate the truth of the allegations about Nicole because he could see the  "the problem," which was the poor relationship between Nicole and C.  In addition to David and Nicole, he eventually spoke with Crumb-Perez, Mathews, A.'s counselor, and an investigator from the Department of Children and Family Services.  He also spoke briefly with Nicole's father, but not about the conduct alleged in the motion.  He did not speak with David's mother, at whom Nicole allegedly spit; he believed Nicole had denied intentionally spitting on her. He did not speak with C. himself about the alleged incidents or why C. felt as he did about his mother.  In Davi's view, his role was not to figure out why the relationship between Nicole and C. was so poor.  (Davi testified that he did not know of any way in which David had contributed to the poor relationship between C. and his mother.  As for Nicole, Davi expressed concern only about the fact that she breastfed C. until he was three years old.)  Rather, Davi believed that his role was to try to figure out how the court could "fix it" and what could be "put in place to help the family move forward."  His recommendation continued to be that the family must reunify, and he believed that family therapy was necessary to achieve that.  He recommended that the parties be ordered to comply with Mathews' recommendations.

¶ 20    As part of this line of questioning, David's attorney attempted to inquire about verbal statements Davi had made during prior court appearances, to the effect that Davi had "no idea"

why C. was so angry at his mother. (Davi filed no written reports to the court in his role as GAL.) The trial court barred any such questions on the ground that David's attorney had not provided transcripts of any such statements.

¶ 21    Regarding his communications with Crumb-Perez, Davi identified only three:  his conversation with her after court on December 16, 2016; an email to her on April 25, 2017, notifying her that Mathews had been appointed as the reunification counselor and asking her to share her thoughts about C. with Mathews; and a conversation on September 18, 2017 (two days before the present hearing). During the most recent conversation, Crumb-Perez reported that C. was handling things better and had not been as angry during the summer. Accordingly, the counseling had been reduced to once every two weeks. C. sometimes spoke with his mother when she had video calls with A. and he often cursed her out. When Davi asked Crumb-Perez about how "this thing" began, she said that there was "a lot of history of mom being abusive," and that there had been some physical abuse of C. by Nicole—choking and punching—when he was in first or second grade. The abuse was reported to DCFS. The divorce occurred when C. was in third grade. (C. was now in eighth grade.) Davi believed that there was no reference to any recent abusive activity by Nicole. As for family counseling involving Nicole and C., Crumb-Perez had spoken with Mathews a few months earlier and supported such counseling. Although Davi found Crumb-Perez difficult to work with, he did not recommend that C. get a different counselor because C. was "established" with Crumb-Perez.

¶ 22    The next witness called was David. He testified that, during the first couple of joint counseling sessions with Mathews, they went over the allegations of his motion to restrict parenting time. According to David, Nicole admitted telling the boys that she was going to remove them from David's custody and apologized for spitting on his mother during the incident in August

2016. He did not recall what Nicole had said about the allegations that she shoved and threw things at C. Nicole admitted using marijuana but defended her use of it. David thought the PEACE program and joint counseling had been helpful, but it did not really resolve the issues between C. and Nicole. David believed that C. harbored a deep mistrust and anger toward Nicole that was "rooted in abuse, whether it's physical or emotional." After the August 2016 incident during which Nicole spit on David's mother and the police were called, David saw C. crying alone in a bathroom. C. was also very angry and had trouble sleeping, and fell behind in school. During the 2016-17 school year, C. had As and Bs in the first quarter, but his grades got progressively worse.

¶ 23    C. had recently decreased the frequency of his sessions with Crumb-Perez. C., who had an individualized educational plan (IEP), also saw the school psychologist and school social worker regularly. Going forward, David wanted Nicole to get individual counseling and then move to joint counseling with C. He was willing to facilitate such joint counseling. David noted that Nicole sometimes had contact with C. when she picked A. up for visits, when C. wanted to come out and see her.

¶ 24    Upon questioning by the trial court, David acknowledged that C. was not seeing Nicole during the past school year when his grades were getting worse. C.'s grades for the fourth quarter were a B, a C, and a D. C. also failed math. This fall, C. was attending school. He, David, and A. ate breakfast together in the morning. In the afternoon, C. was home with David's mother for about an hour before David got home from work.

¶ 25    Following David's testimony, the hearing broke for lunch. After the break, David's attorney asked the trial court to reconsider its decision not to let him inquire into Davi's prior statements to the court. The trial court stated that it would allow inquiry only as to whether Davi

recalled his earlier statements, and if Davi did not remember them "then we're done." Davi said he did not recall his earlier statements.

¶ 26    David's next witness was Nicole. She acknowledged that there had been some difficulties between her and C. during his stay with her in the summer of 2016, but there were ups and downs. She did yell at him, "maybe once every day." Later, Nicole stated that she yelled at C. "a lot" because she was his mother and "that's what moms do." She also swore at him. She admitted that A. had been present when she yelled and swore at C., in both Colorado and Illinois. She did not shove or throw things at C., and denied that he had spent a night in the bathroom or at the home of one of her friends while he was in Colorado. She did use marijuana when the boys were visiting in the summer of 2016, but not when they were with her.

¶ 27    Nicole also admitted that she had gone to David's parents' house in August 2016 and had spit on David's mother during an argument. She explained that she had arrived in Illinois on August 6th and had not been able to see the boys for a few days. When she was on a video call with A., his grandmother called him for lunch. Nicole mistakenly thought A.'s grandmother was yelling at him and "went into mama bear mode" and traveled to their house, furious. That was when the argument occurred and the police were called. She had not had any further incidents with David's parents since then.

¶ 28    Nicole denied that she had stopped the joint counseling sessions with Mathews. (During the questioning about this, the trial court advised her to "[l]ose the attitude.") Asked to explain her May 31, 2017, email to Davi, she conceded that she had "had enough" of the joint counseling sessions but stated that she was willing to meet with Mathews again.

¶ 29    Nicole thought C. was angry at her because David was alienating C. from her. Asked if she had ever given Mathews any evidence of alienating behavior by David, Nicole stated that

David had refused to answer the phone to schedule a playdate and was "running [her] down" by filing the motion to restrict her parenting time. She also identified a Facebook post in which C. had called her a "hippie passivist." She explained that C. had been angry at her because she had called the police when she believed that "[her] three-year old" was playing Grand Theft Auto and was unattended. Nicole believed that David must have used the term "hippie passivist" to describe her because C. would not have known it otherwise. She believed C. was angry at her now because David had "an anger management problem" that he had inherited from his parents. Nicole stated that C. must have been "brainwashed" because otherwise no child would say such things to his parent. Nicole also stated that C. cursed at her but there were no repercussions. She acknowledged that she had done things that could have made C. angry (like not handling the divorce very well) but denied doing anything to C. himself that might have made him angry.

¶ 30    The next witness was Crumb-Perez. As she was testifying about her qualifications, the trial court interrupted to state, *sua sponte*, that it would not allow her to testify as an expert witness—*i.e.*, to give her opinion regarding C.'s diagnoses or on other topics requiring expert knowledge—because she had not been disclosed as an expert before trial. David pointed out that he had disclosed Crumb-Perez as a witness in his pretrial memorandum and that Nicole had not served any interrogatories requesting the disclosure of expert witnesses, but the trial court responded that "you don't have to do that anymore." Crumb-Perez then began describing the initiation of C.'s counseling and her contacts with Davi (which included only the three contacts he had noted). When Crumb-Perez was asked about whether she had seen any "symptoms" in C. during his treatment, the trial court again blocked the testimony *sua sponte*. However, Crumb-Perez was allowed to testify about C.'s behavior during sessions, which included crying, shaking, and tangential thinking. That behavior had mostly stopped by the beginning of summer (2017).

Asked about whether she had been concerned by any interactions with his mother that C. described, Nicole objected on the ground of hearsay. David responded that, under recent amendments to the Act, hearsay regarding abuse was admissible if corroborated. The trial court stated that David had not laid the foundation and then directly asked Crumb-Perez if, as a mandated reporter of child abuse, she had reported any abuse of C. Crumb-Perez said no. The trial court sustained the objection. The trial court also sustained a hearsay objection to the question, "Did C. ever indicate to you why he was angry with his mother?" David next asked whether Crumb-Perez had had a session with Mathews and the Tams, but the trial court interrupted and re-asked the question in its own words. The trial court then prevented David from asking whether Crumb-Perez had found C.'s accounts to be coherent, ruling that this was also a matter of expert opinion.

¶ 31    During Davi's cross-examination of Crumb-Perez, she confirmed that, during her December 2016 conversation with him, she had indicated that she did not yet fully know what was going on with C. However, when she spoke with Davi most recently in September 2017, she did tell him what she believed the issue was. Specifically, C. was very angry at Nicole from the "past history" of abuse, and his ongoing anger when he was with her triggered "distressing memories" that included events as far back as second or third grade. Crumb-Perez had not investigated the truth of those memories herself: although the truth of C.'s recollections was an important factor, Crumb-Perez had no doubt as to their veracity based on the way C. had been presenting during sessions. Specifically, C. avoided talking about his mother's past behavior toward him, and "when he does, he's crying and shaking," which led Crumb-Perez to believe that "something ha[d] definitely happened." Of course, she had also considered the effect of other stressors on C., including the divorce and his relationship with David. She had been able to explore that with C.

¶ 32    Regarding her intake procedures, Crumb-Perez stated that she usually saw the parent and child together at the first session unless either the parent or the child asked to meet separately.  In this case, neither asked to meet separately.  In fact, David brought that option up, saying that it was okay if C. wanted to meet alone with Crumb-Perez, but C. declined.  Both David and C. spoke when explaining what had been happening.

¶ 33    Crumb-Perez had not sought to meet with Nicole for intake, but she obtained Nicole's consent to C.'s treatment.  In February 2017, Nicole made an appointment to see Crumb-Perez.  During this session, Crumb-Perez did not ask Nicole directly about the past events C. had recounted.  However, Nicole said that she wanted C. to forgive her for things in the past.  Asked why she had not asked Nicole about the truth of C.'s memories, Crumb-Perez said that she had not had much opportunity to direct the conversation:  instead, Nicole was "talking and yelling at me pretty much the whole time."  In fact, Nicole's behavior during the session provided some support for Crumb-Perez's assessment that C. was being truthful about Nicole's past treatment of him, in that Nicole had been extremely emotional from the start of the session, yelling and blaming Crumb-Perez for preventing her from seeing C.  Further, confronting Nicole with C.'s memories of her would not have been particularly useful.  Crumb-Perez's focus with C. was to help him process traumatic events and get him more emotionally stabilized.

¶ 34    The trial court questioned Crumb-Perez directly, asking about what she knew of C.'s problems at school.  She was aware that C. had been getting bad grades, was not doing his homework, and had displayed some anger at school.  The trial court asked if the anger was because "[h]e's 13."  Crumb-Perez agreed that was part of it, but C. had also said that it was hard for him to concentrate at school because of "things going on with his mom."  Crumb-Perez confirmed that, since August 2016, Nicole had seen C. for a few hours on Mother's Day and a few times when she

came to the house to pick up his brother. Asked if she had ever considered whether medication might be helpful for C., Crumb-Perez said that she had brought up the possibility of medication for depression or anxiety to David a couple of times, but that was not her field of expertise as she was not a psychiatrist. She did not know whether David had ever followed up with that suggestion. As to C.'s current state, she did not know whether his grades were better or worse now. However, his emotional health was better over the summer—overall, his symptoms had gone down—and that was why they had reduced the frequency of the counseling sessions. She did not have a time frame for terminating the counseling.

¶ 35    Crumb-Perez testified that C. had "ongoing stressors" from current behavior by Nicole and that his anger toward her was not based only on past events. She had told Davi that. That current behavior included Nicole calling and texting C. at midnight and "trying to get him to talk to her when he's not wanting to." Nicole was recently blocked on C.'s cell phone, but that happened only a few months ago.

¶ 36    The trial court questioned Crumb-Perez directly again, asking whether she knew of any "consequences" David had imposed for C.'s "acts of disrespect to his mother," such as yelling or swearing at her. Crumb-Perez knew that David told C. not to talk to his mother like that, but she did not know of any other consequences. The trial court then asked whether she believed that C. "feels empowered right now to decide when he can and cannot see his mother." Crumb-Perez answered that C. had made the decision that he did not want to see his mother. Parenting time was "not being forced on him" right now, so to an extent his decision had been respected. C. had threatened to run away or commit suicide if he were forced to see Nicole. C. reported three suicide attempts in the past, either when he was with his mother or shortly afterwards. C. described attempting to cut himself with a knife but not going through with it. She had told David this.

¶ 37     On further redirect, Crumb-Perez stated that C. did not feel in control of the process (regarding parenting time with Nicole), and in fact he felt frustrated at his lack of control. He was also frustrated by the "failure of those who are supposed to protect him and listen to him." Crumb-Perez identified this frustration as one of C.'s major problems. C. wanted to be protected from Nicole. Although C. had not been around Nicole much recently, when they were in each other's presence the interactions got heated and they both began yelling, which triggered C.'s memories. Davi suggested to Crumb-Perez that Nicole and C. simply got upset with each other and asked whether that was "somehow some type of terrible event." Crumb-Perez said no, it was not, but the ongoing angry interactions made C. fearful that the "alleged past abuse" could happen again. That abuse was emotional as well as physical. Crumb-Perez believed that C.'s descriptions of Nicole calling him names and putting him down constituted emotional abuse.

¶ 38     After the close of Crumb-Perez's testimony, David advised the court that he had no further witnesses for that day but would like to present C. for an *in camera* interview the next day. Noting that it was then 3 p.m., the trial court said that, if the "evidence was such" that it needed to hear from C., it would let the parties know by the end of the day. David rested his case.

¶ 39     Nicole then moved for a directed finding. As to the petition for a rule to show cause, she noted that David had not identified any terms of any court orders that she had violated. As to the motion to restrict parenting time, she contended that David had not shown that her conduct seriously endangered C.'s mental, emotional or physical health as required by the applicable legal standard. Responding, David did not address the petition for a rule to show cause, but he argued that he had presented ample evidence that Nicole's behavior was abusive and had affected C.'s mental and emotional health, including Nicole's own admissions that she yelled and cursed at C. on a daily basis in Colorado, and Crumb-Perez's description of the negative impact on C.

¶ 40    The trial court ruled in favor of Nicole:

> "The motion for directed finding is granted and here's why:  No. 1, on the petition
> for rule to show cause, you offered no evidence in support of any violation of a court order.
> ***
>
> * * *
>
> The petition to modify visitation is being brought— In your petition you never
> asked that her visitation be suspended.  You just asked that it be modified and that she get
> counseling, but it was not conditioned upon her getting counseling.  And under 603.10,
> restriction of parental responsibilities, I have to make a finding by the preponderance of
> the evidence that a parent has engaged in conduct that seriously endangers the child's
> mental, moral, or physical health or that significantly impairs the child's emotional
> development.  I'm not prepared to make that finding at all.  No. 1, the fact that she yells at
> her child on a daily basis is not serious endangerment.  The fact that she spit on her former
> mother-in-law, I heard no evidence that it had any impact on the child or whether the child
> even saw this.  No one gave me any evidence of that.  I don't find any evidence to support
> anywhere near the basis of this, that it rises to this level."

The trial court stated that, given that Crumb-Perez, a mandated reporter, had never reported abuse,
Nicole's conduct did not rise to the level of abuse.  Although there was yelling, "yelling is part of
what happens with teenagers."  The trial court noted that C.'s grades had deteriorated last year and
stated that, "so far, just dad taking care of him and mom not being there isn't working.  Everyone
agrees it isn't working."  Parenting time would resume, starting with one hour every two weeks at
the Family Center.  It would be supervised and Davi would transport C. to and from the visits to
prevent David from "get[ting] the kid in the car and then *** talk[ing] about how bad mom is

ahead of time." After six weeks of such parenting time, the trial court would see what had happened.

¶ 41 The trial court then *sua sponte* entered other orders, ruling that C. could no longer see Crumb-Perez because she did not know whether his grades had gone down, but David had testified that C.'s grades did worsen, and C. had been solely in David's care during that time. Further, the trial court disapproved of Crumb-Perez's conducting intake without input from Nicole, stating that this procedure, "is not, to me, competent counseling or therapy." The trial court ordered Davi to suggest the names of a new therapist for C. and a psychiatrist who would perform a psychiatric evaluation of C. Lastly, the trial court denied the motion for an *in camera* interview of C. because it was not necessary to allow the trial court to arrive at a decision.

¶ 42 David moved to vacate the directed finding, arguing that the trial court erred in, among other things, barring opinion testimony from Crumb-Perez, preventing David from introducing evidence of C.'s statements regarding Nicole's interactions with C., denying the motion for an *in camera* interview of C., and finding that David had not presented evidence of a sufficient threat to C.'s mental and emotional health to warrant restricting Nicole's parenting time. David also objected to the trial court's order that Crumb-Perez cease treating C. In February 2018, the trial court denied the motion to vacate.

¶ 43 The supervised visits between C. and Nicole took place in October and November 2017. C. refused to attend the last one, and Davi did not recommend that further visits be arranged. C. began seeing a psychologist, Daniel Fisher. According to a June 2018 letter from Dr. Fisher, he and Mathews had conducted joint counseling sessions between C. and Nicole earlier in the spring. Although Nicole was "cooperative, patient and loving" and David was also supportive, C.'s school functioning declined during those sessions, he began seeing his school psychologist more, and he

began threatening self-harm. Dr. Fisher commented that C. clearly showed symptoms of PTSD and opined that "[h]is difficulty of being in the presence of his mother is not based on him having a 'bad attitude' or 'just being defiant.' " The family sessions with Nicole had been discontinued, but Dr. Fisher believed that C.'s individual counseling should continue. No court orders reflecting the discontinuation of parenting time between C. and Nicole, or referring in any other way to such parenting time, were entered after the denial of David's motion to vacate.

¶ 44 Meanwhile, Davi petitioned for GAL fees. Earlier, the trial court had ordered that Nicole would pay one-third of Davi's fees and David would pay two-thirds. David objected to Davi's fee petition on the ground that Davi had not performed his statutory duties of investigating the allegations of the motion to restrict parenting time and providing a report to the court on that topic. David also filed a motion to reallocate the GAL fees, asserting that Nicole should be primarily responsible for those fees because it was her conduct that led him to file the motion to restrict parenting time and that prolonged the proceedings on that motion. On February 15, 2019, the trial court awarded GAL fees of $19,878, ordering David to pay $14,190 and Nicole to pay the remaining $5,688. On March 22, 2019, the trial court denied David's motion to reallocate. This appeal followed.

¶ 45                                        II. ANALYSIS

¶ 46 On appeal, David challenges (1) the trial court's entry of a directed finding on his motion to restrict parenting time and (2) its rulings regarding the GAL fees. Before we consider those issues, however, we must address the motion filed by Nicole, seeking to dismiss the appeal.

¶ 47                           A. Motion to Dismiss the Appeal

¶ 48 Nicole moved to dismiss the appeal on two grounds. As to David's appeal of the trial court's order entering a directed finding on his motion to restrict parenting time, Nicole asserts it

is moot because she is not currently exercising any parenting time with C. Nicole also asserts that David's arguments about the award and allocation of the GAL fees should be stricken because they do not comply with Illinois Supreme Court Rule 341(h)(7) (eff. Jan. 1, 2016).

¶ 49 Nicole's mootness argument is not well-founded. "An appeal is moot if 'no actual controversy exists or if events have occurred that make it impossible for the reviewing court to grant the complaining party effectual relief.' " *In re Marriage of Eckersall*, 2015 IL 117922, ¶ 9 (quoting *In re Marriage of Peters–Farrell*, 216 Ill. 2d 287, 291 (2005)). Nicole asserts that we cannot grant David effective relief because her parenting time with C. "has not been reinstated." This statement is at odds with the record. On September 20, 2017, the trial court ordered that Nicole have parenting time with C. On February 13, 2018, the trial court denied David's posttrial motion. No other orders regarding parenting time have been entered.

¶ 50 Nicole appears to be referring to the fact that, in December 2017, Davi advised the trial court that he was not asking for more supervised visits to be scheduled. Nicole also asserts that, on February 13, 2018, "it was agreed" that she would not have further parenting time with C. However, the order entered on that date does not reflect any such agreement. Nicole currently enjoys the legal right to parenting time with C., even if she has agreed not to exercise that right. Accordingly, the issue is not moot.

¶ 51 We reject her second argument as well. Rule 341(h)(7) requires an appellant's arguments to be supported with citations to pertinent legal authority and portions of the record, and we may deem an argument forfeited if it does not comply with this requirement. *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. Here, however, David's argument is not so deficient that it prevents us from conducting a meaningful review. Accordingly, we decline to simply strike it. The motion to dismiss the appeal is denied.

¶ 52                          B. Rulings Related to Parenting Time Hearing

¶ 53    David contends that the trial court erred in several of its evidentiary rulings during the hearing on parenting time and also erred in entering a directed finding in favor of Nicole. A trial court's evidentiary rulings are reviewed for abuse of discretion. *People v. Montano*, 2017 IL App (2d) 140326, ¶ 74. A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11. As for the trial court's grant of a directed finding, we review such a ruling *de novo*. *Friedman v. Safe Security Services, Inc.,* 328 Ill. App. 3d 37, 47 (2002). We will affirm that grant only where the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Id.*

¶ 54    The central issue at the hearing was whether the evidence demonstrated that Nicole had "engaged in any conduct that seriously endangered [C.'s] mental, moral, or physical health or that significantly impaired [C.'s] emotional development." 750 ILCS 5/603.10 (West 2016).

¶ 55    David asserts that the trial court erred in excluding, as hearsay, testimony about C.'s out-of-court statements regarding the alleged abuse by Nicole. He notes that such testimony is admissible as an exception to the hearsay rule under section 5/606.5(c) of the Act:

        "Previous statements made by the child relating to any allegations that the child is
    an abused or neglected child within the meaning of the Abused and Neglected Child
    Reporting Act,[] or an abused or neglected minor within the meaning of the Juvenile Court
    Act of 1987,[] shall be admissible in evidence in a hearing concerning allocation of parental
    responsibilities ***. No such statement, however, if uncorroborated and not subject to

cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 750 ILCS 5/606.5(c) (West 2016).[1]

David argues that C.'s statements to others regarding Nicole's actions toward him were admissible under this statute because they were corroborated by the evidence that C. displayed symptoms consistent with PTSD stemming from his interactions with Nicole. See *In re A.P.*, 179 Ill. 2d 184, 199 (1997) ("corroborating evidence [is] independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred"). Further, C. was "subject to cross-examination" because David had offered (indeed, requested) to make C. available for an *in camera* interview.

¶ 56    David also argues that the trial court should have allowed C. to testify *in camera*, given his ability to testify about the central issue at the hearing—the allegations that Nicole had emotionally and physically abused him. C.'s testimony took on added evidentiary importance because the trial court prevented other witnesses from testifying to C.'s statements about the allegations. David also notes that the wishes of the child is one of the factors a trial court should consider when determining parenting time. 750 ILCS 5/602.7(b)(2) (West 2016).

¶ 57    David next challenges the trial court's *sua sponte* decision to bar Crumb-Perez from offering any expert opinions. He argues that Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007) requires the pretrial disclosure of expert witnesses and their opinions only "upon written

---

[1] Under the statutes referenced in this provision, an "abused child" is defined to include a child whose parent inflicts on the child physical injury that causes "impairment of physical or emotional health." Abused and Neglected Child Reporting Act, 325 ILCS 5/3 (West 2016); Juvenile Court Act of 1987, 705 ILCS 405/2-3(2)(i) (West 2016).

interrogatory," and Nicole did not serve any such interrogatories in this case. See *In re J.D.*, 332 Ill. App. 3d 395, 403 (2002) ("A party must first serve the opposing party with a written interrogatory" to trigger the duty of disclosure; absent this, there is no basis for barring the admission of expert testimony at trial).

¶ 58 David concludes his arguments about the trial court's ruling on his motion to restrict Nicole's parenting time with the argument that, even if the evidentiary errors alleged above were not reversible in themselves, the trial court's entry of a directed finding in Nicole's favor was error.

¶ 59 Nicole offers no argument or legal authority showing that David's arguments regarding the trial court's evidentiary rulings are incorrect. Instead, she offers only the bare assertion that the trial court did not err in its evidentiary rulings and a reiteration of her argument that the issue is moot. She does not defend the entry of the directed finding at all. We consider the merits of David's arguments despite the lack of input from Nicole. *First Capitol Mortgage Corp. v. Talandis Construction Corp.,* 63 Ill. 2d 128, 133 (1976) (a reviewing court should decide the merits of an appeal where the record is simple and the claimed error is such that a decision can be made easily without the aid of argument from the appellee).

¶ 60 We have no difficulty concluding that the trial court abused its discretion by barring Crumb-Perez from offering expert testimony, as Rule 213(f) does not support the imposition of such a sanction where no written interrogatories have been served. *J.D.*, 332 Ill. App. 3d at 403. The trial court's statement that "you don't have to do that anymore" is a clear misstatement of the law. See *Olsen*, 2015 IL App (2d) 140267, ¶ 11 (ruling resting on error of law is abuse of discretion). Further, there was no showing that Crumb-Perez's opinions would surprise or prejudice Nicole (who had seen most of those opinions previously in the two letters written by

Crumb-Perez), or that David had acted in bad faith. See *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 110 (2004).

¶ 61    The merits of David's other evidentiary arguments are less clear-cut. David has not fully established that testimony about C.'s descriptions of Nicole's interactions with him qualified for the hearsay exception contained in section 606.5(c) of the Act. Similarly, there is no absolute right to present a child's testimony and the decision whether to allow a child's testimony at all or *in camera* is a matter firmly committed to a trial court's discretion. *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 24. Nevertheless, a child's wishes are one factor for a trial court to consider in setting parenting time (750 ILCS 5/602.7(b)(2) (West 2016)), especially where the child is mature and able to express those wishes. In this case, testimony from C. took on particular importance because the central issue was the nature of Nicole's interactions with him, a matter C. was uniquely able to address. Due to the trial court's other evidentiary rulings and the lack of any direct investigation of the facts by the GAL, the only source of direct evidence about those interactions was C. and Nicole herself. As the trial court was charged with determining whether those interactions seriously endangered C.'s mental health or emotional development, it behooved the court to allow the full presentation of testimony, including C.'s testimony, on that topic.

¶ 62    Further, the trial court erred in entering a directed finding denying the motion to restrict parenting time. A directed finding can be affirmed only where the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Friedman,* 328 Ill. App. 3d at 47. That standard is not met here. It was undisputed that Nicole was verbally abusive toward C. every day while he was with her in Colorado, and that her past and ongoing interactions with C. resulted in physical symptoms (sleeplessness) as well as signs of severe mental and emotional distress. In her letters,

which were admitted as evidence, Crumb-Perez found that C.'s symptoms suggested PTSD (an opinion later corroborated by Dr. Fisher). The severity of the symptoms belies the trial court's characterization of the evidence as simply the kind of conflict that is normal between parents and their teenaged children. The trial court also misstated the record, incorrectly stating that there was no evidence that Nicole's act of spitting on C.'s grandmother affected him (David testified that he saw C. crying after this episode, and it appeared to be one of the reasons C. gave for his anger toward Nicole). The trial court also mistakenly stated that David did not ask that Nicole's parenting time be suspended until she got counseling, but he clearly requested exactly that in his motion. Other statements and rulings by the trial court were similarly at odds with the record. For instance, the trial court ruled that David could not transport C. to future sessions of parenting time so that he could not "talk about how bad mom is ahead of time," despite the fact that there was no evidence of any such conduct by David. The trial court also appears to have disregarded the testimony from David and Crumb-Perez that C.'s emotional state was improving when it ruled that C. should no longer see Crumb-Perez for counseling.

¶ 63    Accordingly, we vacate the trial court's orders of September 20, 2017, granting a directed finding in favor of Nicole on the motion to restrict parenting time and barring C. from being treated by Crumb-Perez. We remand for a rehearing governed by appropriate evidentiary rulings in conformity with this disposition.

¶ 64    We note that David requested that the case be remanded to a different judge. We agree that the record reveals instances of apparent hostility toward David, his attorney, and Crumb-Perez. See, *e.g.*, ¶ 30, *supra*. We are troubled by those indications of hostility, and we cannot disregard the possibility that such hostility contributed to the trial court's decision to sharply limit the evidence David was permitted to present and its entry of a directed finding in favor of Nicole.

Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) grants a reviewing court, in its discretion, the power to reassign a matter to a new judge on remand. *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002). We conclude that the interests of justice are best and most efficiently served by assigning this case to a different judge on remand. Accordingly, we are remanding this case to the presiding judge of the appropriate division of the circuit court for reassignment to a different judge for future matters.

¶ 65                              C. Award and Allocation of GAL Fees

¶ 66    David's remaining arguments on appeal focus on the trial court's award of fees to the GAL and its denial of David's motion to reallocate the responsibility for those fees. Ordinarily, we would review these rulings for abuse of discretion. *In re Marriage of Soraparu*, 147 Ill. App. 3d 857, 864 (1986). Here, however, we have already found that the trial court displayed sufficient hostility toward David that we cannot be certain that its rulings were not infected by bias. Accordingly, we vacate the rulings regarding GAL fees as well, and remand for rehearing before the judge to whom this case is reassigned.

¶ 67                                     III. CONCLUSION

¶ 68    For the reasons stated, the orders entered by the circuit court of Du Page County on September 20, 2017 (entering a directed finding in favor of Nicole on the motion to restrict parenting time and barring C. from obtaining counseling from Crumb-Perez), and on February 15 and March 22, 2019 (setting the GAL fees and denying David's motion to reallocate those fees) are vacated. The cause is remanded to the chief judge of the appropriate division of the Du Page County circuit court for reassignment to a different judge for further proceedings consistent with this disposition.

¶ 69    Judgment vacated; remanded.